STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant Servellon

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON SERVELLON,<br><br>Defendant. | **Case No.:** CR 19–689 RS<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:**        Courtroom 3, 17th Floor<br>**Hearing Date:**   April 7, 2020<br>**Hearing Time:**   1:00 p.m. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Aaron Servellon, a 20-year-old young man with no prior criminal record or history, now comes before this Court for engaging in street-level drug activity related to a single $25 sale of crack cocaine. Prior to his arrest in the instant case, Mr. Servellon had worked various legitimate jobs during the three years that he has been in the United States. He sent what money he could back to Honduras to help financially support his grandparents, who had raised him since he was five years old. The desire to give back to his grandparents, coupled with the dangerous and impoverished environment in Honduras, had led him to the U.S. in the first place before he reached the age of 18. Before he left, he had suffered threats of violence from gangs that have ravaged towns and cities throughout Honduras. It is against this backdrop that Mr. Servellon made the poor decision to engage in the criminal conduct that led to his arrest in the instant matter. By the time of his sentencing hearing, he will have spent approximately 3 ½ months in custody—a significant and substantial punishment for a 20-year-old who has never been in jail before. Furthermore, he faces draconian immigration consequences as a result of this conviction. Even though this case constitutes his one and only criminal conviction, that is enough to lead to not only his deportation back to Honduras, but also to ineligibility for numerous avenues of relief in immigration proceedings and permanent inadmissibility to the United States in the future. Before his near-certain deportation, he will serve additional time in immigration custody, the length of which is unknown.

Mr. Servellon takes responsibility for his actions and understands that he must face consequences for what he has done. He respectfully requests that the Court vary downwards and impose a sentence of time served—effectively 3 ½ months.[1] Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

---

[1] The PSR recommends a downward variance to eight months. PSR Sentencing Recommendation at 1. As promised in the plea agreement, the government will recommend a sentence of six months. Mr. Servellon believes a greater downward variance to time served is warranted in his case for the reasons laid out *infra*.

DEF'S SENT. MEM.
*SERVELLON*, CR 19–689 RS

1

**ARGUMENT**

2

**I.    A Sentence Of Time Served Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

3

4       In sentencing Mr. Servellon, this Court must consider all of the directives set forth in 18 U.S.C.

5   § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United*

6   *States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The

7   overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than

8   necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.

9   2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the

10  offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford

11  adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant;

12  and (6) provide the defendant with needed educational or vocational training, medical care, or other

13  correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also

14  directs the Court to consider additional factors, including: the nature and circumstances of the

15  offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of

16  sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing

17  Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, §

18  3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

19      Pursuant to the plea agreement in this matter, the parties have agreed to a final offense level of

20  13. Mr. Servellon agrees that his Criminal History Category is I. *See* Pre-Sentence Report ("PSR") ¶

21  26. The resulting advisory Guidelines range is 12–18 months.

22      **A.    The nature and circumstances of the offense**

23      Mr. Servellon was arrested as part of the government's Federal Initiative for the Tenderloin

24  ("FITT") targeting cases arising in the Tenderloin for federal prosecutions, many of which involve

25  relatively minor drug offenses that normally would be prosecuted only at the state level. Along those

26  lines, Mr. Servellon's conduct in the instant matter consisted of selling $25 worth of

27  methamphetamine to an undercover San Francisco Police Department ("SFPD") officer. When he

28

was arrested, additional controlled substances were also found on his person.[2] This offense was a

quintessential street-level drug sale that did not involve violence, weapons, threats, or other

aggravating factors. When placed in perspective, Mr. Servellon's offense is relatively minor, and

accordingly does not warrant additional time in custody beyond that which he has already served.

Mr. Servellon filed no motions in the case, and pleaded guilty at his second appearance in

District Court. The Court should take into consideration such timely acceptance of responsibility.

**B.      The history and characteristics of Mr. Servellon**

1. Mr. Servellon's personal background

Mr. Servellon was born in Tegucigalpa, the capital city of Honduras, but spent most of his

childhood in the town of Agua Caliente. *See* PSR ¶¶ 31–32. His father played no part in his life; to

this day, Mr. Servellon does not even know his father's identity. *Id.* ¶ 32. His mother left Honduras

for the U.S. when he was five years old in hopes of employment opportunities. *See id.* Since his early

childhood, then, both of Mr. Servellon's biological parents had little to no presence in his everyday

life. Instead, his maternal grandparents raised him as best they could under the difficult circumstances

faced by many Hondurans who live in abject poverty. *See id.* The family was not well-off and their

lives were not easy; to the contrary, meeting basic needs was challenging and Mr. Servellon

remembers food being scarce. *See id.* Because of the family's financial struggles, Mr. Servellon

began working when he was only 11 years old. *Id.* What this means is that when he was still in

elementary school, he was already working in the fields—a physically demanding job that takes great

toll on the bodies of healthy adults, let alone on those of young children like Mr. Servellon.

When he was 14, Mr. Servellon began attending school in Tegucigalpa, which required him to

move to that notoriously dangerous city. *See id.* ¶ 33. In the next few years, local gangs began to

threaten and target Mr. Servellon. *Id.* Given how gangs have overrun Honduras, *see infra*, Mr.

Servellon understandably was scared that these threats would eventually and inevitably turn into

physical violence. It is this fear, combined with the pressure and desire to increase his earning power

to help support the grandparents who had raised him, that led him to move to the U.S. when he was

---

[2] As noted in the PSR, these substances were fentanyl, crack cocaine, heroin, and methamphetamine. PSR ¶ 7. The exact net weights are unknown.

only 17 years old. *See id.* Sadly, his grandmother passed away from Alzheimer-related issues shortly after he left, a loss that affected him greatly. *Id.* Once here, he reunited with his mother in Maryland for a brief time before living in Atlanta and then moving to the Bay Area in the fall of 2019. *Id.* ¶ 34. In the three years that he has been in the country, he has worked in carpentry as well as day labor to support himself and to earn money to send back to Honduras. *Id.* ¶ 41. Unfortunately, he still felt great pressure to earn and send back even more money, which ultimately led him to the exceptionally poor decision to sell drugs that has landed him here in front of the Court.

For the vast majority of his time in the U.S., until the offense in the instant case, Mr. Servellon was engaged in legitimate work that did not involve criminal conduct. Indeed, the incident here was his first arrest and only contact whatsoever with the criminal justice system. By his sentencing date, he will have been in custody on this case for approximately 3 ½ months. For a 20-year-old who has never spent any amount of time in jail before, 3 ½ months is a lifetime, particularly in recent weeks as the unprecedented coronavirus pandemic has spread worldwide. Countless medical experts and other officials agree that conditions in jails and prisons provide an ideal breeding ground for the spread of infectious diseases such as COVID-19. *See, e.g.*, Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, NEW YORKER (March 20, 2020); [3] Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus "Incubators"*, NPR (March 13, 2020); [4] Nicole Wetsman, *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, THE VERGE (March 7, 2020, 8:30 AM). [5] As of March 26, 2020, a nurse who works at Santa Rita Jail, where Mr. Servellon has been detained during the pendency of this case, has tested positive for COVID-19. Angela Ruggiero, *Alameda County Jail Reports Nurse Has Tested Positive for Coronavirus; Facility's First Coronavirus Case*, THE MERCURY NEWS (March 26, 2020, 1:47 PM). [6] If Rikers Island in New York City—**with an infection rate nearly eight times higher than the city**

---

[3] Available at https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

[4] Available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[5] Available at https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

[6] Available at https://www.mercurynews.com/2020/03/26/alameda-county-jail-reports-first-coronavirus-case-a-nurse/.

**and 78 times higher than the country**—is any indication, it is only a matter of time before COVID-19 spreads like wildfire in Santa Rita. *See COVID-19 Infection Tracking in NYC Jails*, THE LEGAL AID SOCIETY (based on data available on March 31, 2020);[7] *see also* Meagan Flynn, *Top Doctor at Rikers Island Calls the Jail a "Public Health Disaster Unfolding Before Our Eyes*, THE WASHINGTON POST (March 31, 2020, 4:00 AM).[8] Reducing the jail population density by imposing time-served sentences where appropriate, such as in the instant matter, would protect not only Mr. Servellon, but also the community at large. *See* Jean Casella & Katie Rose Quandt, *US Jails Will Become Death Traps in the Coronavirus Pandemic*, THE GUARDIAN (March 30, 2020, 10:12 AM).[9]

All Mr. Servellon wants to do at this point is return to Honduras where he can continue to financially support his aging grandfather, pursue a new trade such as auto mechanics, and avoid any further involvement with criminal conduct. He has learned his lesson and he has learned it well; imposing a sentence that would keep him in jail for several more months during a pandemic would serve no additional purpose and would be overly punitive.

### 2. Immigration consequences for Mr. Servellon

It is almost certain that Mr. Servellon will be deported following resolution of the instant matter. Because of the nature of the charge, this conviction will trigger draconian immigration penalties beyond deportation. Almost every avenue for relief that he otherwise would be able to pursue as a potential defense in immigration proceedings will no longer be available to him. Most severely, Mr. Servellon will be rendered permanently inadmissible to the United States, meaning that he will be barred from re-entry for the rest of his life. Finally, before his deportation, he will spend an uncertain period of time in immigration detention—a time period that could easily stretch to a month or more—which will serve as an additional custodial consequence of his conduct.[10]

### 3. Conditions in Honduras

As set forth above, Mr. Servellon came to the United States from Honduras because there was

---

[7] Available at https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.
[8] Available at https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.
[9] Available at https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island.
[10] An ICE detainer has already been lodged against Mr. Servellon. PSR at 1.

DEF'S SENT. MEM.
*SERVELLON*, CR 19–689 RS

1  no realistic opportunity of gainful employment there and because he was a target of gang-related

2  violence that pervades the country. Although this fact does not excuse Mr. Servellon's criminal

3  conduct, it does provide an important perspective, especially when considering the role in creating

4  those violent conditions in Honduras played by the same federal government prosecuting him here.

5        Honduras is a dangerous and violent country with one of the highest murder rates in the world.

6  *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL [hereinafter

7  2018 Crime & Safety Report][11]; *see also* Gangs in Honduras, INSIGHT CRIME [hereinafter Gangs in

8  Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not

9  at war.").[12] Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center,

10  are two of the ten most dangerous cities in the world.[13] Central America Refugee Crisis, U.N.

11  REFUGEE AGENCY[14]; *see also* Gangs in Honduras at 1. Violence in Honduras includes "homicide,

12  extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country

13  Report of Human Rights Practices for 2018, Honduras, U.S. DEPT. OF STATE, BUREAU OF

14  DEMOCRACY, HUMAN RIGHTS AND LABOR at 1.[15]

15        Although there are many reasons for the high crime and murder rates, political instability and

16  gang activity have contributed to the violence for decades. In the 1980's, the United States used

17  Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.*

18  Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries

19  unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal

20  groups began to form throughout Central America. *Id.* According to the Wilson Center, crime

21  generally goes unreported because of corruption, weak law enforcement, and active criminal groups.

22  *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON

23  CTR RPT. ON AMERICAS [hereinafter Crime and Violence] at 1–2.[16] In 2009, a military coup ousted

24  _____

25  [11] Available at https://www.osac.gov/Content/Report/84d448fd-c42b-462c-91ce-15f4ae5df483.
   [12] Available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf.

26  [13] Mr. Servellon's hometown is approximately a two-hour drive away from Tegucigalpa. PSR ¶ 33.
   He also lived in Tegucigalpa while attending school between the ages of 13–17. *Id.*

27  [14] Available at https://www.unrefugees.org/emergencies/central-america/.
   [15] Available at https://www.state.gov/reports/2018-country-reports-on-human-rights-

28  practices/honduras/.
   [16] Available at

1   Honduras President Zelaya making Honduras the first Central American country to undergo a coup in

2   nearly two decades, and in 2017, the most recent Honduran presidential election came under question

3   as many organizations noticed irregularities with the results. *See* Central America's Violent Northern

4   Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN

5   RIGHTS WATCH (Dec. 2017).[17] Because of the instability and unrest within Honduras, the United

6   States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report.

7   These travel warnings are indicative of the safety concerns in the country and demonstrate why many

8   people such as Mr. Servellon are fleeing in hopes of creating safer and more sustainable lives.

9       **C.**    **The need to avoid unwarranted sentencing disparities**

10       A time-served sentence would avoid unwarranted disparities with defendants in strikingly

11   similar cases arising from the FITT. This becomes especially apparent when one looks at the

12   circumstances of cases ending in a time-served sentence where the defendants had a more extensive

13   criminal or deportation history than in the instant matter. The following cases are illustrative:

14       •  *United States v. Jesus Flores*, CR 19-429 SI. Mr. Flores was arrested for a $15 drug

15           sale. Officers found $932 cash and other drugs on him, including 56 grams of cocaine

16           base, 38.2 grams of heroin, 32.5 grams of methamphetamine, and 31.1. grams of

17           marijuana (gross weights). He had been deported twice in the past. Mr. Flores'

18           Guidelines range was 10–16 months. Judge Illston sentenced him to time served

19           (effectively four months).

20       •  *United States v. Wilfredo Cabrerra*, CR 19-452 WHO. Mr. Cabrerra was convicted of a

21           $17 heroin sale. His Guidelines range was 8–14 months. Mr. Cabrerra's record was far

22           more serious than Mr. Servellon's, as it included three prior convictions for drug

23           sales—including one that resulted in a four-year prison sentence—and six deportations.

24           Judge Orrick sentenced him to time served (effectively four months).

25       •  *United States v. Brayan Arteaga*, CR 19-426 WHO. Mr. Arteaga was convicted of a $16

26

27   https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CAR
     SI%20REPORT.pdf.

28   [17] Available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-
     protect-free-expression.

crack cocaine sale. He was on probation at the time of the offense, and faced a Guidelines range of 8–14 months with an offense level of 10 and a Criminal History Category of II. Judge Orrick sentenced him to time served (effectively one month).

- *United States v. Ristir Trejo*, CR 19-535 RS. Mr. Trejo faced charges stemming from four different drug sales, including fentanyl, over a period of 15 months. His record included a prior misdemeanor drug conviction as well as a prior federal misdemeanor conviction for illegal entry. His Guidelines range was 21–27 months, significantly higher than Mr. Servellon's range. Judge Seeborg sentenced Mr. Trejo to time served (effectively 6 ½ months).

- *United States v. Jose Ramos-Varela*, CR 19-713 EMC. Mr. Ramos-Varela was arrested for a $20 methamphetamine sale, and additional heroin was recovered from his person when he was arrested. He had one prior deportation that occurred subsequent to a prior felony drug conviction. His Guidelines range was 10–16 months. Judge Chen sentenced him to time served (effectively two months).

## CONCLUSION

For all the reasons set forth above, Mr. Servellon respectfully requests that the Court impose a sentence of time served. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:     March 31, 2020                    Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

                                            /S
ANGELA CHUANG
Assistant Federal Public Defender